UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HUGH MCGINLEY, etc., et al.,

      Plaintiffs,

vs.                            CASE NO. 8:11-CV-322-T-EAK-MAP

DENNIS E. JETTON, et al.,

      Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART STATE EMPLOYEE DEFENDANTS' CORRECTED MOTION FOR FINAL SUMMARY JUDGMENT

      This matter comes before the Court pursuant to the State Employee Defendants' Corrected Motion for Final Summary Judgment (Doc. # 150), filed on August 14, 2013, and the Plaintiffs' Response (Doc. # 158). For the reasons that follow, the Court grants the Motion in part.

### BACKGROUND

      On February 13, 1998, a United Postal Service ("UPS") vehicle traveling southbound on Interstate 275 struck and killed Kevin McGinley, the son of Hugh and Gillian McGinley. (Doc. # 3). The Florida Highway Patrol ("FHP") initiated a traffic homicide investigation, which Defendant Corporal Dennis E. Jetton led with the aid of additional FHP officers. (Doc. # 145-61 to 64). On March 22, 1999, Defendant Jetton authored the Traffic Homicide Investigation Report ("THI Report"), which exceeded 300 pages and contained numerous diagrams and interviews, as well as his conclusions. Id. In the report, he determined Kevin McGinley was a pedestrian in the roadway under the influence of alcohol, struck by an unknown vehicle that fled the scene, and, thereafter, was struck and killed by the UPS vehicle. Id. Defendant Jetton concluded the UPS driver could not take evasive actions to prevent the collision, and, thus, did not legally contribute to Kevin McGinley's death. Id.

1

FHP subsequently released the THI Report to the Plaintiffs approximately four months later on July 21, 1999. (Doc. # 145-4, 5). Plaintiffs finished their preliminary review of the THI Report July 30, 1999, and learned the identities of Christopher Grubb, Timothy Shoenig, Anthony Llloyd, Michael Lipp, and the driver of the UPS vehicle. (Doc. # 158, p. 5). Defendant Assistant State Attorney Wayne Chalu reviewed the completed THI Report, and ultimately decided criminal charges were not warranted. (Doc. # 145-1). Discontent with the results of the THI Report and the State Attorney's decision not to proceed with criminal charges, on March 23, 2000, Plaintiffs authored a two-page correspondence to the attention of Marty McDonald, counsel to then-Florida Governor Jeb Bush, which criticized alleged inadequacies in the investigation and handling of their son's case. (Doc. # 145-20). Over the course of the next eleven months, Plaintiffs authored at least five similar correspondences to the office of Governor Bush. (Doc. # 145-18; 145-21; 145-6; 145-7; and 145-30). Plaintiffs met with newly-elected Defendant State Attorney Mark Ober to discuss the office's decision not to prosecute criminal charges, and Defendant Ober directed his investigator Defendant Richard Hurd to conduct a follow-up investigation. (Doc. # 145-47). After the follow-up investigation, Defendant Ober's Homicide Committee voted unanimously that there was insufficient competent evidence to warrant criminal charges, and notified Plaintiffs of this decision on July 20, 2011. (Doc. # 145-9).

In January 2002, Plaintiffs received Mr. David Brill's Analysis of Physical Evidence Submitted by Rene Green (the "Brill Report"), which evaluated photographic evidence and the THI Report. (Doc. # 145-37, p. 1). In his nine-page report, Mr. Brill analyzed FHP's skidmark evidence and stopping ability of the UPS vehicle, the final rest position of Kevin McGinley, the physical evidence on the roadway, and the location of the determined point of impact. Id. Mr.

Brill found misidentification of evidence, unresolved conflicts between physical evidence and eyewitness testimony, and improper mathematical computations. Id.

In addition to the Brill Report, Mr. McGinley requested Dean A. Wideman perform an analysis and assessment of information regarding FHP's investigation of Kevin McGinley. (Doc. # 145-38, p. 2). Mr. Wideman reviewed police reports, medical examiner reports, family member and witness statements, private investigator reports, laboratory reports, scene photographs, and forensic expert reports. Id. He was also afforded the opportunity to view and photograph physical evidence in FHP's possession. Id. Based on his review and analysis of testimonial conflicts and improper calculations, on September 22, 2003, Mr. Wideman similarly criticized Defendant Jetton's investigation and conclusions. Id.

On February 13, 2002, Hugh McGinley initiated a wrongful death lawsuit in state court as the "parent and natural guardian of Kevin McGinley." (Doc. # 145-22). Mr. McGinley named Anthony Lloyd, Christopher Grubb, Timothy Shoenig, Michael Lipp as defendants, and later amended the complaint to add UPS. (Doc. # 145-22). On March 2, 2004, UPS achieved dismissal based on the statute of limitations, and on November 4, 2004, the state court resolved the remainder of the counts via final summary judgment in favor of the remaining defendants. (Doc. # 145-22).

After continued requests from the Plaintiffs, FHP initiated an internal investigation with the FHP Office of Professional Conduct ("OPC Investigation") on June 18, 2008, led by Defendant Sergeant Diane Martinez. (Doc. # 159-17). During the pendency of the OPC Investigation, on November 10, 2008, Plaintiffs filed a § 1983 civil rights action in state court, which was timely removed to this Court. (Doc. # 145-27). On October 12, 2010, this Court dismissed the § 1983 civil rights action due to the statute of limitations. (Doc. # 145-52).

On February 2, 2009, Defendant Martinez completed the OPC Investigation and authored the OPC Investigation Report ("OPC Report"), approved through FHP supervisors in March of 2009, and released to the Plaintiffs April 8, 2009. (Doc. # 159-12). Plaintiffs contend the OPC Report affirmed the following information for the first time:

1. Jetton admitted his assertion regarding the hit-and-run vehicle as set forth in the THI Report was incorrect and speculative;
2. Jetton retracted the hit-and-run-vehicle theory, and referred to it only as a possibility;
3. Jetton stated during the OPC Investigation that there was never any physical evidence to support the possibility of a hit-and-run vehicle striking Kevin McGinley;
4. Jetton acknowledged he smeared the shoe print on the bumper of the UPS tractor-trailer believed to be Kevin McGinley's;
5. Jetton purposely failed to interview witnesses possessing relevant information; and
6. Jetton failed to take into account the physical altercation that occurred before the collision when investigating the death of Kevin McGinley.

(Doc. # 158, pp. 10–11). Based on the foregoing affirmations and conduct of the Defendants outlined in the OPC Report, Plaintiffs allege they were misled with respect to Kevin McGinley's cause of death, unaware of the necessary facts to bring a wrongful death action against UPS before the limitation period expired February 13, 2000, and brought the present action which is before the Court for summary judgment. (Doc. # 3).

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, discovery, disclosure materials on file, and any affidavits demonstrate there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

> The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The appropriate substantive law will guide the determination of which facts are material and which facts are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Anderson, 477 U.S. at 248. However, if the evidence is merely colorable...or is not significantly probative...summary judgment may be granted. Id. at 249–250.

## ANALYSIS

### 1. Statute of Limitations

#### A. Determination and Application

State law determines the applicable statute of limitations period for claims brought under 42 U.S.C. § 1983. City of Hialeah v. Rojas, 311 F.3d 1096, 1102 (11th Cir. 2002). In Florida, the residual personal injury statute of limitations governs § 1983 claims; however, federal law determines the accrual date. Kelly v. Serna, 87 F.3d 1235, 1238–1239. Accordingly, § 1983 claims will accrue, and the statute of limitations will begin to run, when a plaintiff knew or should have known she suffered an injury and the identity of the perpetrator. Mullinax v. McElhenney, 817 F.2d 711, 716 (11th Cir. 1987). Even still, the statute of limitations will not commence until facts supporting a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for her rights. Rozar v. Mullis, 85 F.3d 556 (11th Cir. 1996).

Plaintiffs commenced the present cause of action December 11, 2010, which was timely removed to this Court. (Doc. # 1; 3). Therefore, to survive a statute of limitations challenge, this cause of action must have not accrued prior to December 11, 2006. Plaintiffs possessed facts sufficient to support a wrongful death cause of action against UPS prior to December 11, 2006.

Plaintiffs received and reviewed FHP's THI Report on or before July 30, 1999. (Doc. # 158, p. 5). This report disclosed the investigating officers, identity of the UPS driver, methods employed for the investigation, eyewitnesses, diagrams, mathematical calculations, evidence descriptions, and Jetton's conclusions. (Doc. # 145-61 to 64).

No later than September 12, 2000, Plaintiffs learned of additional evidence via FHP's supplement investigative report, (Doc. # 145-64), which they highlighted in their letters to Governor Bush and his counsel. This included previously-undisclosed confidential informants, eyewitness interviews and polygraph tests, 911 calls that conflicted with the THI Report, as well as FHP's alleged failures to complete certain investigative functions. (Doc. # 145-6, 145-7, 145-18, 145-20, 145-21). The first letter, dated March 23, 2000, expressed Plaintiffs' dissatisfaction with the investigation and Defendant Jetton's continued involvement:

> [O]ur feelings are that Corporal Jetton's report has caused this [case] to be investigated as an accident to the exclusion of any criminal causes. [Major Leggett] further informed me that Corporal Jetton remains the lead investigator in this case. I cannot, therefore, accept [FHP's] assurance that it is being investigated with an open mind.

(Doc. # 145-20). On April 1, 2000, Plaintiffs expressed "deep concerns" regarding the investigation and FHP's handling of the case:

> The content of [Major Leggett's response] causes me to express deep concerns over the manner in which several important interviews were conducted on an informal basis. I profess to not knowing what an "informal" interview means, it obviously signifies, however, that no recording was made and no signed statement obtained.
>
> It seems that each passing week adds to the horror of this investigation. How can anyone accept the findings of Florida Highway Patrol, Tampa Police, F.D.L.E. and the State Attorney's Office that this has been a thorough and competent investigation?
>
> As you are aware, Marty, we have been extremely involved in the F.H.P. investigation. Much of the evidence to date has been

> uncovered as a result of our own investigation. It is fair to say that a large part of this evidence, as well as the knowledge we have gained regarding the events of that night, are not reflected in the [THI Report].

(Doc. # 145-18) (emphasis added).  On May 8, 2000, Plaintiffs continued to doubt the veracity of

the THI Report and conclusions; the Plaintiffs "suspected" the conclusions were amiss:

> Our investigators have now proven beyond doubt that the last two 911 calls, putting Kevin down in the highway, were indeed made before Kevin was hit by the U.P.S. truck, as we had suspected. This has been confirmed by the information given by Mr. Carr who drove past just moments before Kevin was killed and saw Kevin standing by the concrete barrier of the center median, a full four lanes across the highway.

(Doc. # 145-21) (emphasis added).  On August 4, 2000, Plaintiffs again expressed their concerns

with respect to Defendant Jetton's investigation and conclusions:

> [W]e have provided substantial evidence that clearly disproves the conclusions of Corporal Jetton's [THI] Report…[t]here has been a consistent refusal on the part of all agencies involved in this investigation to consider or respond to the evidence that has been carefully documented and repeatedly presented to them.
> \*\*\*
> Colonel Hall also makes reference to "a reconstruction of the events, a careful examination of witness interviews and physical evidence and follow up inquiries."  Had such a reconstruction and examination of physical evidence taken place, it would have clearly demonstrated that Corporal Jetton's conclusions and depictions of events were totally inconsistent with his own records and measurements of the physical evidence at the scene.  Furthermore, any examination of witness interviews would have immediately exposed the woeful inadequacy of Corporal Jetton's interviews in addressing the considerable evidence that indicates the possibility that Kevin was murdered.

(Doc. # 145-6) (emphasis added).  And on September 12, 2000, Plaintiffs explained their

concerns to the personal attention of Governor Jeb Bush:

> [W]e have provided substantial evidence to indicate that the investigating officers from F.H.P. and F.D.L.E. knowingly submitted false and deliberately misleading police reports,

withholding vital evidence which, if included, would have clearly exposed the erroneous conclusions of their report. The actions of the investigating officers in this case have to be construed, at the very least, as extreme incompetence. The possibility certainly exists, however, that their actions have far more sinister motivation and represent criminal wrongdoing.

(Doc. # 145-7) (emphasis added).

Plaintiffs next retained at least two experts to evaluate photographs and evidence FHP gathered on or before September 22, 2003. Importantly, Mr. Brill opined to the following in 2002:

Based upon the photographic evidence, the measurements of the physical evidence found at the scene, and mathematical computations of the data, I am of the opinion that the traffic crash reconstruction, conducted by the traffic homicide officer is in error in his conclusions and interpretation of the physical evidence. This is based upon the calculations and observations outlined in this report.

(Doc. # 145-37, p. 1) (emphasis added). And on September 22, 2003, Dean Wideman concluded:

From the available information, it appears that there was no proper documentation, collection, and examination of biological evidence [from relevant areas of inquiry].
                              ***
[I]t is evident that there are conflicting statements from those individuals involved in the accident; significant inconsistencies between the investigative reports, photographic evidence, and eyewitness testimonies; and deficiencies in the scene investigation.
                              ***
After reviewing all of the available case information, it is clear that Kevin McGinley was in the highway due to a physical altercation with another person(s) rather than being there on his own free will and without force. In addition, there is sufficient evidence to support the conclusion that Kevin McGinley's death was not an accident but rather the result of an unlawful act of homicide, especially when considering all of the independent accounts, statements, and/or eyewitness testimonies.

(Doc. # 145-38, p. 5–6) (emphasis added). The foregoing correspondences to Governor Bush's office, as well as the retention of experts and review of their criticisms and conclusions, further

demonstrate Plaintiffs possessed information sufficient to support a wrongful death cause of action against UPS prior to December 11, 2006.

Plaintiffs urge the Court that not until the release of the OPC Report did Plaintiffs definitively know their rights were infringed and by whom; however, a cause of action may accrue before a claimant possesses all of the evidence ultimately relied on for a cause of action. U.S. v. Kubrick, 444 U.S. 111 (1979); see Price v. U.S., 775 F.2d 1491 (11th Cir. 1985) (holding once a plaintiff in a medical malpractice case discovers her injury is probably attributable to some act of those who treated her, there is no longer any reason to toll the statute of limitations); see also Paige v. Police Dept. of City of Schenectady, 264 F.3d 197 (2d Cir. 2001) (holding while concealed facts may strengthen a plaintiff's case through corroboration, absence of said facts did not sufficiently justify plaintiff's failure to pursue case); see also Baker v. Board of Regents, 991 F.2d 628 (10th Cir. 1993) (holding a plaintiff need not know all of the evidence ultimately relied upon for cause of action to accrue). While the findings in the OPC Report might have bolstered or strengthened Plaintiffs' cause of action, Plaintiffs possessed facts sufficient to support a wrongful death cause of action against UPS prior to December 11, 2006.

### B. Continuing Injury

Plaintiffs contend the assurances from FHP and other officials that leads would be investigated, as well as the OPC Investigation and resulting OPC Report, collectively constitute a continuing violation in this case, which would toll the four-year statute of limitations period. The critical distinction in continuing violation analysis is "whether the plaintiff[] complain[s] of the present consequence of a one-time violation, which does not extend the limitations period, or the continuation of a violation into the present, which does." Lovett v. Ray, 327 F.3d 1181, 1183 (11th Cir. 2003) (quoting Knight v. Columbus, Ga. 19 F.3d 579, 580–581 (11th Cr. 1994))

(internal quotation marks omitted).  To apply continuing injury and preclude summary judgment, there must be some continuation of the injury on or after December 11, 2006.

While Defendant Jetton and FHP officials further investigated this matter after Plaintiffs received and reviewed the THI Report July 30, 1999, there is no evidence Defendant Jetton's "grossly negligent" investigation or actions continued to December 11, 2006.  While Jetton and FHP conducted additional interviews related to the accident, (Doc. # 145-64), Plaintiffs were in possession of this information no later than September 12, 2000.  (Doc. # 145-6, 145-7, 145-18, 145-20, 145-21).  The alleged inadequacies and improper actions with respect to the remainder of the Defendants—the mischaracterization of the OPC Investigation as administrative rather than criminal, assurances that leads would be investigated, and FHP's supervision thereof—do not constitute continuing injury, and, thus, this Court declines to toll the statute of limitations.

### C. **Equitable Tolling**

Plaintiffs implore the Court to apply equitable tolling based on what Plaintiffs characterize a "grossly negligent" investigation and supervision, as well as continual acts to cover up said actions.  Equitable tolling is an extraordinary remedy that must be used sparingly.  Hunter v. Ferrell, 587 F.3d 1304 (11th Cir. 2009); Steed v. Head, 219 F.3d 1298, 1300 (11th Cir. 2000).  Equitable tolling of a limitations period is warranted "when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence."  Downs v. McNeil, 520 F.3d 1311 (11th Cir. 2008) (quoting Steed, 219 F.3d at 1300) (internal quotation marks omitted).

Here, Plaintiffs fail to demonstrate the extraordinary circumstances which justify the rare application of equitable tolling.  In Mr. McGinley's plain and unmistakable words, Plaintiffs were "extremely involved" throughout the course of the investigation.  (Doc. # 145-18).  Plaintiffs

continually criticized FHP's investigation and channels of command, retained multiple experts to reconstruct and evaluate the evidence, presented those evaluations via reports to authorities to highlight conflicts and inconsistencies in Defendant Jetton's conclusions, and suspected law enforcement officers of sinister motivation and criminal wrongdoing to the extent they demanded an independent criminal investigation through the Governor's Office as early as 2000. (Doc. # 145-6, 145-7, 145-18, 145-20, 145-21). Thus, this Court finds Plaintiffs possessed information sufficient to support a wrongful death cause of action against UPS prior to December 11, 2006, and cannot find these circumstances warrant the application of equitable tolling.

### 2. Collateral Estoppel

Defendants seek the application of collateral estoppel, urging the Court to preclude this litigation based on this Court's dismissal of the 2008 § 1983 claim. Collateral estoppel is appropriate when a moving party establishes the following: 1) the issue at stake must be identical to the one decided in the prior litigation; 2) the issue must have been actually litigated in the prior proceeding; 3) the prior determination of the issue must have been a critical and necessary part of the judgment in that earlier decision; and 4) the standard of proof in the prior action must have been at least as stringent as the standard of proof in the later case. Steed v. EverHome Mortg. Co., 308 Fed.Appx. 364, 372 (11th Cir. 2009) (quoting In re Southeast Banking Corp., 69 F.3d 1539, 1552 (11th Cir. 1995)) (quotations and citations omitted). The issue at stake in the current litigation is not identical to the prior litigation. Plaintiffs now allege, among other issues unique to this litigation, the OPC Investigation continued the Plaintiffs § 1983 injury, and the OPC Report confirmed the allegedly grossly negligent actions of the Defendants. (Doc # 3; 158). Therefore, application of collateral estoppel is improper.

### 3. Absolute Immunity

Defendants Ober and Chalu seek the application of absolute immunity to bar liability. A prosecutor is entitled to absolute immunity for all actions he takes while performing his function as an advocate for the government. Rivera v. Leal, 359 F.3d 1350, 1353 (11th Cir. 2004) (citing Buckley v. Fitzsimmons, 509 U.S. 259 (1993)). This function includes initiation and pursuit of criminal prosecution, Imbler v. Pachtman, 424 U.S 409, 431 (1976), and most appearances before the court. Rivera, 359 F.3d at 1353 (citing Burns v. Reed, 500 U.S. 478, 492 (1991)). The prosecutorial function does not include, however, serving as an investigator. Buckley, 509 U.S. at 275. Courts look to the nature of the act performed, rather than the identity of the actor, to determine whether application of absolute immunity is appropriate. Id. at 259 (citing Forrester v. White, 484 U.S. 219, 229 (1988)). When the functions or actions of a prosecutor and detective are the same, so too is the immunity that protects them. Id. at 276.

Here, the record demonstrates Defendants Ober and Chalu undertook roles beyond those which absolute immunity would protect. Defendant Ober testified he entertained Plaintiffs' request that someone from the State Attorney's Office speak with Mr. Mark Allen and his wife concerning the death of the Plaintiffs' son. (Doc. # 159-35, p. 23). Defendant Chalu testified while his initial involvement with this matter was limited to the determination of criminal charges, in his capacity as bureau chief he later supervised other assistant state attorneys involved with the investigation of this case. (Doc. # 145-48, p. 14). He further testified assistant state attorney Sharon Vollrath updated him periodically on the status of the case, and specifically noted Ms. Vollrath "did quite a bit of work on the case" after Defendant Chalu undertook a supervisorial position. Id. at p. 27. Thus, Defendants Ober and Chalu have failed to meet their burden justifying

the application of absolute immunity.  See Burns, 500 U.S. at 486 (holding defendant bears the burden of proof to justify application of absolute immunity).

### 4. Qualified Immunity

All moving Defendants assert qualified immunity for protection from liability.  Qualified immunity serves to protect officials "required to exercise their discretion" as well as "the related public interest in encouraging the vigorous exercise of official authority."  Butz v. Economou, 438 U.S. 478, 506 (1978).  Public officials are immune from liability "for the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818).  To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)) (internal quotation marks omitted).

After a defendant proves he or she was acting within his or her discretionary authority, the inquiry then turns to a two-part test, where the plaintiff bears the burden to demonstrate qualified immunity is inappropriate.  Lee, 284 F.3d at 1194.  This two-part test inquires whether a plaintiff's allegations, if true, establish a constitutional violation; and second, whether the violated constitutional right was clearly established which a reasonable official would have known.  Vinyard, 311 F.3d at 1346 (citing Harlow, 457 U.S. at 818) (emphasis added).  A constitutional right is clearly established when it has "been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he [or she] is doing violates federal law."  Stanley v. City of Dalton, Ga., 219 F.3d 1280 (11th Cir. 2000); see Evans v. Stephens, 407 F.3d 1272, 1182 (11th Cir. 2005) (holding that "a law is clearly

established only if it dictates, that is, truly compels, the conclusion for all reasonable, similarly situated public officials that what defendant was doing violated [p]laintiffs' federal rights in the circumstances"). The notice to officials must be "fair and clear." Hope v. Pelzer, 536 U.S. 730, 745 (2002) (quoting U.S. v. Lanier, 520 U.S. 259, 271 (1997)) (internal quotation marks omitted). An officer will be entitled to qualified immunity if his actions were objectively reasonable. Vinyard, 311 F.3d at 1346. The Supreme Court determined this inquiry need not occur in any sequence, and courts "may exercise sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances[.]" Pearson v. Callahan, 555 U.S. 223, 236 (2009).

### A. State Attorney's Office Defendants

Defendants Ober, Chalu, and Hurd—all employed with the State Attorney's Office—assert qualified immunity as to Plaintiffs' allegations. Defendants Ober and Chalu were acting within their discretionary authority throughout the course of events amounting to the current litigation. Defendants Ober and Chalu evaluated the case for criminal charges, met with the Plaintiffs and their attorney to discuss Plaintiffs' concerns, and supervised an investigatory follow-up. Similarly, Defendant Hurd was equally acting within his discretionary authority as an investigator for the State Attorney's Office, as he interviewed and collected additional evidence for Defendants Ober and Chalu's evaluation of criminal charges.

Plaintiffs assert these collective Defendants violated clearly established constitutional rights when they purposely and actively worked to conceal the necessary facts for Plaintiffs to file this cause of action—specifically, the negligence of the UPS driver—and that these respective Defendants' actions were objectively unreasonable given the circumstances; however, Plaintiffs fail to meet this burden. Plaintiffs allege Defendants Ober, Chalu, and Hurd each failed to fully

investigate Kevin McGinley's death, noting Ober's acknowledgment that investigations should be complete and thorough. (Doc. # 158, p. 33) (citing Doc. # 159-35). The qualified immunity analysis is objective rather than subjective, Vinyard, 311 F.3d at 1346, and the actions of Defendants Ober, Chalu, and Hurd—review of the case for criminal charges and subsequent follow-up investigation—did not obviously violate Plaintiffs' substantive due process or access to courts; they evaluated the criminal charges and evidence before them, and concluded criminal charges were not appropriate. (Doc. # 159-11). Plaintiffs fail to demonstrate how these actions violated Plaintiffs' rights, or how objectively reasonable officials in Ober, Chalu, and Hurd's positions would have known their actions violated Plaintiffs' substantive due process or access to courts. Defendants Ober, Chalu, and Hurd exercised their discretion throughout the events leading to this litigation, and their actions were objectively reasonable given the circumstances.

## B. THI Investigation Defendants

Defendants Mauriello, Hall, Knight, Leggett, Lee, Dey, Sewell, and Jetton assert qualified immunity. Similar to the State Attorney's Office Defendants, this Court finds these Defendants, with the exception of Defendant Jetton, were acting within their discretionary authority throughout the course of events amounting to the current litigation. Defendant Jetton's investigation of the traffic homicide was within the scope of his discretionary authority at FHP. See Mills v. Parker, 379 Fed.Appx. 852 (11th Cir. 2010) (holding officer's excessive force was within discretionary authority); see also Post v. City of Fort Lauderdale, 7 F.3d 1152 (11th Cir. 1993) (holding police officer's use of chokehold and excessive force fell within officer's discretionary role). Although the investigation was within the scope of his discretionary authority at FHP, the action of smearing the footprint attributed to Kevin McGinley was not within the scope of Defendant Jetton's discretionary authority at FHP. Additionally, Plaintiffs have sufficiently established material,

undisputed facts to preclude the application of qualified immunity to Jetton's actions—Defendant Jetton admittedly smeared a footprint attributed to Kevin McGinley, and also admitted his conclusions with respect to the hit-and-run theory were speculative and lacked sufficient evidentiary support. (Doc. # 159-12). A reasonable officer in Jetton's position would have known these actions violated Plaintiffs' substantive due process and access to courts.

The remainder of the defendants either assisted or supervised the THI Investigation within their discretionary authority at FHP and the Florida Department of Law Enforcement ("FDLE"). Defendant Dey functioned as the FDLE agent in charge of reviewing Defendant Jetton's investigation, and all of his alleged conduct fell within the scope of his discretionary authority at FDLE. (Doc. # 159-34, p. 13). Defendant James Sewell indirectly supervised Dey through the FDLE hierarchy. (Doc. # 159-32, p. 5). Defendant Lieutenant Mauriello oversaw Defendant Jetton's direct supervisor, (Doc. # 159-31, pp. 12–13), Defendant Major Leggett oversaw Defendant Mauriello's direct supervisor, (Doc. # 159-26, p. 7), Defendant Colonel Hall oversaw Defendant Leggett's direct supervisor, (Doc. # 159-25, p. 15), and Defendant Bureau Chief James Lee oversaw the investigation at a higher level. (Doc. # 159-24, p. 32). Plaintiffs quote Defendant Mauriello that he "procrastinated and deliberately withheld sending" documents related to Plaintiffs' public records request before May of 2000; however, the full quote, taken in context, illuminates the extent and duration of this alleged violation:

> Mr. McGinley made a "Public Records Request" to the Hillsborough County State Attorney's Office.  Assistant State Attorney Sharon Vollrath did not have in her possession that document. Because I had the document I related that I would contact our Legal Division to allow the release. I contacted Legal who cited the release of test information as it applies to employment polygraph examinations.  However, they related that it does not address investigative questions and results. Upon receiving this I contacted Sharon Vollrath and advised that I would send Mr. McGinley these documents.  Yes, I did procrastinate and deliberately withheld

sending the documents.  <u>Yet all I had was the actual questions that</u> <u>were asked and not any pre-test interview.  I continued to vacillate</u> <u>whether to provide these documents or not.  During the first week</u> <u>of May I sent Mr. McGinley the document.  After I sent the</u> <u>document I advised Sharon Vollrath that Mr. McGinley was in</u> <u>possession of this document.</u>

(Doc. # 159-12, p. 76) (emphasis added).  It is clear from the full quote in context that Defendant

Mauriello's conduct fell within his discretionary authority in determining whether the requested

document was subject to a public records request.  (Doc. # 159-6).  Further, the allegation that he

concealed documents in his possession is without merit.  (Doc. # 158, p. 31; 159-31).  Defendant

Mauriello testified he was under the impression that FHP maintained copies of the documents in

his trunk related to the investigation, (Doc. # 159-12, p.76, ll. 12–17), and Plaintiffs have failed to

demonstrate otherwise, or that the allegedly-concealed documents were not provided to Plaintiffs.

As with the State Attorney's Office Defendants, Plaintiffs fail to meet their burden to prove

Defendants Dey, Sewell, Mauriello, Knight, Leggett, Hall, or Lee violated clearly established

constitutional rights, or that if a clear violation occurred, these respective defendants' actions were

objectively unreasonable given the circumstances.  Defendant Dey conducted his investigation on

behalf of FDLE and arrived at his conclusions with the results of his interviews and the evidence

FHP gathered.  (Doc. # 159-34).  Plaintiffs fail to present evidence that Defendant Dey's actions

impeded Plaintiffs' ability to identify facts necessary to bring a wrongful death cause of action.

Additionally, Plaintiffs fail to prove a reasonable officer in Defendant Dey's circumstances would

have known his actions impeded Plaintiffs' substantive due process or access to courts—

Defendant Dey submitted his report to his superior, explained his conclusions, and ended his

investigation upon the approval of his report.  <u>Id</u>.  These actions were objectively reasonable given

the circumstances.

Defendant Sewell, in his capacity as regional director of the FDLE Tampa office, assigned the FDLE investigation to Defendant Dey.  (Doc. # 159-32, p. 6).  At the conclusion of his investigation, Defendant Dey authored a report, which a special agent supervisor would have reviewed.  Id. at p. 22.  Defendant Dey then explained his investigation and conclusions to Defendant Sewell.  Id. at pp. 13–14.  Sewell testified Defendant Dey had an exemplary reputation and record as an investigator, and Defendant Dey's investigation and conclusions were factually substantiated.  Id. at p. 23.  Plaintiffs fail to demonstrate how Sewell's actions violated Plaintiffs' substantive due process or access to courts—Defendant Sewell reviewed Defendant Dey's report, discussed the report with Defendant Dey, and approved the report.  Id.  Defendant Jetton's tortious actions were not immediate and obvious, nor was the possibility that said actions would preclude Plaintiffs' substantive due process or access to courts.  Given the circumstances, Sewell's actions were objectively reasonable, and he is entitled to qualified immunity.

Defendants Mauriello, Knight, Leggett, Hall, and Lee supervised Jetton's investigation. Beyond conclusory statements, Plaintiffs fail to allege any facts that would suggest these Defendants violated Plaintiffs' substantive due process or access to courts—these Defendants reviewed Defendant Jetton's work and had no objectively reasonable basis to doubt his investigation was properly conducted within an investigating officer's discretion.  Moreover, objectively reasonable officers in these circumstances would not have known their approval of the THI Report infringed Plaintiffs' substantive due process or access to courts—the THI Report and supplement identified the eyewitnesses, drivers, and evidence utilized in the THI Investigation. (Doc. # 145-61 to 64).  Thus, qualified immunity is proper.

**C. OPC Investigation Defendants**

Defendants Brierton, Chapman, Snow, Noda, Miguel, Case, Czernis, and Martinez assert qualified immunity.

Defendant Colonel David Brierton acted in the scope of his discretionary authority at FHP. Defendant Brierton met with Plaintiffs, listened to their concerns, and reviewed their allegations toward FHP's THI Investigation. (Doc. # 159-15, pp. 6–7). Subsequently, Defendant Brierton discussed the Plaintiffs' allegations with his superior Defendant Colonel Christopher Knight, at which time Defendant Knight instructed Defendant Brierton the investigation was previously reviewed and would remain closed. Id. at pp. 16–17, 21.

Plaintiffs fail to meet their burden to prove Defendant Brierton violated Plaintiffs' substantive due process or access to courts, or that if such a violation occurred, Defendant Brierton's actions were objectively unreasonable given the circumstances. Defendant Brierton met with Plaintiffs, reviewed their concerns, and brought the concerns to the attention of his supervisor, Defendant Christopher Knight, who decided the case had been sufficiently reviewed and would remain closed. (Doc. # 159-15). Plaintiffs contend Defendant Brierton should have disregarded Defendant Knight's determination not to review the case a third time and ordered an investigation; however, Plaintiffs fail to cite any basis for Defendant Brierton to question or reject his superior's determination and orders, or how his actions amounted to a violation of Plaintiffs' substantive due process or access to courts.   Defendant Brierton acted objectively reasonably given the circumstances, and thus qualified immunity applies to his actions.

Defendants Dawn Case and Melinda Miguel actions were within the respective scopes of their discretionary authority as inspectors general in the Office of the Governor of Florida. Defendants Case and Miguel notified Defendant Noda of the Plaintiffs' concerns and complaints.

(Doc. # 159-37). Plaintiffs fail to meet their burden to prove Defendants Case and Miguel violated Plaintiffs' substantive due process or access to courts—Plaintiffs fail to demonstrate how Defendants' actions amounted to a cover-up and in turn prevented Plaintiffs from filing a wrongful death suit; the information was conveyed and the investigation took place. Similarly, Plaintiffs fail to prove that an objectively reasonable officer in the positions of Defendants Case and Miguel could have known their actions would have infringed on Plaintiffs' substantive due process or access to courts.

Defendant Judson Chapman acted in his discretionary authority as legal counsel to the Florida Department of Highway Safety and Motor Vehicles ("DHSMV"). As legal counsel representing DHSMV, Defendant Chapman exchanged correspondence with the Plaintiffs in 2009 regarding the ongoing OPC Investigation, informed Plaintiffs certain public records requests were exempt in accord with Florida Statute 119.071(2)(c)(1) due to the ongoing investigation, and referred further correspondence to the attorney representing DHSMV and FHP in the pending § 1983 litigation. (Doc. # 159-39, p. 13, 20–21). Defendant Chapman did not review the OPC Report Defendant Martinez authored, nor did he have any direct input for the OPC Report. Id. at pp. 22–23. Plaintiffs fail to establish how these actions violated Plaintiffs' substantive due process or access to courts, or how an objectively reasonable officer in Defendant Chapman's circumstances would have known these actions constituted a clear violation of Plaintiffs' rights.

Defendant Martinez was the lead investigator involved with the OPC Investigation. Defendant Martinez reviewed Plaintiffs' allegations, interviewed witnesses, reviewed evidence, sought legal guidance from counsel, and formed her conclusions based on same. (Doc. # 159-12). Defendant Inspector General Laurence Noda, Defendant Director of FHP John Czernis, and Defendant Captain Snow served in supervisorial roles for the OPC Investigation. These

Defendants, however, fail to demonstrate undisputed material facts which would prove their actions occurred wholly within their discretionary authority at their respective agencies. The discrepancies whether the OPC Investigation was classified as criminal or administrative, these four Defendants' respective knowledge of this decision, and their testimony present disputed material facts which preclude a finding they were acting within their respective discretionary authorities. Therefore, the application of qualified immunity is inappropriate.

Accordingly, it is **ORDERED** that:

(1) Defendants' Motion for Summary Judgment is **GRANTED** with respect to the statute of limitations; Plaintiffs' causes of action against all Defendants are time-barred;

(2) Defendants' Motion is **DENIED** with respect to collateral estoppel; Plaintiffs' causes of action are not collaterally estopped;

(3) Defendants' Motion is **DENIED** with respect to absolute immunity; and

(4) Defendants' Motion is **GRANTED** in part and **DENIED** in part with respect to qualified immunity; qualified immunity is applicable to all Defendants with the exception of Defendants Jetton, Martinez, Snow, Noda, and Czernis.

The Clerk of Court is **DIRECTED** to enter judgment for the Defendants and against the Plaintiffs, and to close this case and terminate any pending motions.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 19th day of December, 2013.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to:    All Counsel and Parties of Record